**LACONIA PROPERTIES, LLC – against – TRAVELERS**
**07 CIV   6220  (LAP)**

1.  I submit this affirmation in support of this motion in limine on behalf of Defendant seeking an order prohibiting Neil Schmelkin, PE from offering expert testimony in this matter on the issue of causation of the partial collapse of the parapet wall forming the basis for the instant lawsuit. His opinion testimony should be prohibited because it is based on speculation and unreliable assumption rather than on objective facts. In addition to the faulty factual basis, no reliable engineering methods or analysis were utilized to support the opinions proffered.

2.  The loss alleged by the Plaintiff occurred on July 17, 2006, when a portion of the east facing parapet wall of Plaintiff's building at 4125-4141 Laconia Avenue, Bronx, New York, collapsed. In support of its theory that the loss resulted from a covered cause Plaintiff offered the "expert" testimony of Neil Schmelkin, P.E. Defendant conducted an examination before trial of Mr. Schmelkin on November 12, 2007 and November 30, 2007. A copy of the transcript of that testimony is appended hereto as **EXHIBIT A**.

**THE PLAINTIFF'S ENGINEER MUST BE PRECLUDED FROM OFFERING EXPERT TESTIMONY ON THE ISSUE OF CAUSATION FOR HIS FAILURE TO MEET THE CRITERIA ESTABLISHED TO ASSURE RELIABLITY OF EXPERT TESTIMONY**

3.  To be admitted in evidence expert testimony must be based upon: 1) sufficient factual data; 2) reliable principles and methods; 3) those methods must have been reliably applied to the facts of the case. 28 U.S.C.A. ARTICLE VII, RULE 702. Here, all three of these elements are missing. Thus, the proffered testimony fails of the essential trial purpose for admitting expert testimony; that the testimony be helpful to evaluate evidence that is outside the common understanding of an average juror. *See, U.S. v. Lopez,* 282 F.3d 1, 14 – 15 (1st Cir. 2002).

4.  The "gatekeeping" function of determining the reliability of the expert testimony before its introduction in evidence assigned to the court under *Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) arises from the Federal Rules of Evidence, which "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand". *Daubert,* 509 U.S. 579 at 597. This gatekeeper function has been held to apply to any and all expert testimony sought to be entered into evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999).

5.  Admissibility of expert testimony is established only where there is "a traceable, analytical basis in objective fact." *Bragdon v. Abbott*, 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) *citing General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Specifically, "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" is as a matter of law inadmissible at the trial of the action. *Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167 *citing Joiner*, 522 U.S. at 146, 118 S.Ct. 512.

6.  Schmelkin testified that in his opinion the collapse of part of the east facing parapet wall and the bowing of the remaining portions of not only the east wall parapet, but of the parapet walls on all other exposures, was caused by the confluence of: extreme temperatures of 100° on the date of collapse (causing the masonry to expand); the weight of the signage attached to the wall, and; the method of attachment of the signs to the parapet wall. But, Schmelkin had no reliable evidence of the temperature at the time of failure, relying instead upon his memory that it was hot out, what some unidentified person told him what the temperature had been and his recollection of recent newscasts.(Exh. A, P. 52, L.14 – 24). When asked to describe how heat contributed to the collapse, Schmelkin testified only: "[w]ell, we know as engineers that materials expand at a faster and greater rate in warm temperatures (pg. 53, ln.19-21). After admitting that this 50 year old building had been exposed repeatedly to 100-degree days in its past 50 years of existence (Exh. A P. 54, L. 7-23) Schmelkin could not offer any reliable explanation as to why the heat on this particular

date became a factor in the failure when such high heat had never before caused a collapse, stating instead: "I guess the answer lies in the phenomenon of probability and statistics, which states that not all contributors to a failure will produce a failure at any given time." [page 55, ln. 23 et. sec.] 7.

7. Finally, the fact that the exact same forces were in effect for many years prior to the loss event (50 years), which he agreed had occurred on many prior occasions with no ensuing damage, renders this "engineering" opinion fatally defective and undeserving of being admitted into evidence under the guise of "expert opinion."

8. The signs located on the failed parapet wall consisted of: individual letters spelling out the word "ASSOCIATED;" and a separate block sign that read "SUPERMARKET" (hereinafter referred to as "the signs"). When Schmelkin first inspected the site on July 20, 2006, debris from the collapse had been removed and was unavailable for inspection. (Ex.A, p.34 lns. 8-11; 83 lns. 6-13; 86, lns 7-13.) However, the first "A" from "ASSOCIATED" remained affixed to the remaining wall (Ex. A. p. 35, lns.12-16). Despite an opportunity to observe that portion of the sign, Schmelkin did not know its composition, weight or manner of connection to the wall (p.36, ln. 23-37, ln. 21).

9. Despite testifying that the weight of the signs contributed to cause this loss, Schmelkin admitted he did not know their weight. He viewed no specifications and did no calculations to determine their weight, the design tolerances of the wall, the forces exerted by the signs on the walls or whether and to what extent the forces exerted by the signs exceeded design tolerances. Incredibly, Schmelkin claimed those calculations were irrelevant to his conclusion that their weight was causative of the loss (pgs. 66,ln.11–68,ln.23). It defies logic, reason and generally accepted engineering concepts to conclude that the weight of the signs was irrelevant to a conclusion that their weight contributed to cause the collapse.

10. Schmelkin made no effort to determine how they were connected to the wall and could not articulate how the connections he blames could have contributed to this loss. Though he had ample opportunity to observe the connections used in the remaining "A", he did not. Rather, after stating he had *partially* determined the connection method (p.43,lns.21-23) he admitted making no observations of the connections at issue, basing his *partial* analysis that attachment was "via anchors, rods, dowels *or* bolts" upon his observation "in a portion of the remaining parapet . . . that there was a hole drilled where a bolt would fit through." (p.35,ln.22-36,ln 4). He could not even recall if the drill hole was in the area where the "offending" signs were located or at the point where the remaining "A" was (p.36,lns.5-22). He never saw the 'block' sign from the loci of the collapse or learned how it was connected. He did not calculate the height, width, depth, weight or composition of even the remaining and affixed "A." Schmelkin testified only that other signs from other businesses made of other materials and of other sizes, were affixed by "expansion bolts or through bolts" and so he speculated that the signs at issue were similarly attached. Notably, the walls where those other signs were attached did not collapse.

11. While the load-bearing capacity of a brick and mortar parapet wall, and whether that capacity was exceeded, can be calculated by reasonable engineering methods, Schmelkin did not utilize such a method, nor did he apply such method to the facts of this case so as to give his opinion some reliability. Schmelkin testified that one such method is a "load calculation" which equation is used to "analyze the forces acting on a building or structure" (Ex.A, part 2 of EBT, p.7, ln.10–13). His inability to do so underscores the failure to meet the test of reliability for admission of expert testimony requiring the application of reliable methods to objective facts. The lack of data as to weight and attachment of the signs prevented the performance of the necessary calculations to determine whether these factors contributed to this loss.

12. Schmelkin did not identify the key elements that would support his claim of contribution to the cause of loss, i.e., the weight and attachment methods of the signs. As such he could not even comment on whether they were appropriate to the also uncalculated load-bearing capacity of the wall. He did not differentiate between temperatures on the date of loss and those the building withstood for 50-years. He did not comment on the difference between connections of signs at the area collapse and at non-collapsed areas to determine why they "caused" collapse in one area but not another. He could not exclude age as a contributing cause of the loss (p.59,ln.16-18) and said he excluded other admittedly potential causes; wind and rain, based only upon "my judgment, my opinion" (p.59, lns. 4-17).

13. His conclusion is therefore deficient on all essential elements of reliability that would allow the plaintiff to introduce his testimony as an expert or to allow hearing of his opinions. Unsupported by facts and reliable methodology, these opinions cannot assist the jury to understand the facts in this case.

14. This is the quintessential example of the type of opinion evidence that is connected to existing data only by the bare assertion of resting solely upon the authority of the expert that the courts are directed to exclude from evidence. Having proceeded with no engineering analysis, applied no engineering methods and concluding that it was his "feeling" these elements caused the loss, his opinion must be excluded as the product of the "*ipse dixit*" of the expert. *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999).

SPEYER & PERLBERG, LLP
Attorneys for Defendant

By: _____
Marie E. Garelle (MG-1217)
115 Broadhollow Road, Suite 250
Melville, New York 11747
(631) 673-6670